**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael R. GOLAND,**
**Defendant–Appellant.**

**No. 89–50447.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 1989.

Decided Feb. 26, 1990.

George B. Newhouse, Jr., Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for defendant-appellant.

Before CHOY, TANG, and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

Michael Goland takes an interlocutory appeal in a criminal case charging him with violation of federal election laws. His first trial was bifurcated[1] from his codefendants' trial and ended in a mistrial when the jury could not agree on a verdict. Goland appeals the district court's denial of his motion to dismiss on the ground of double jeopardy. We affirm.

## FACTS

The criminal charges against Goland arise from the 1986 campaign in California for a United States senate seat. The first superseding indictment charged Goland with five counts, all related to violations of the federal election law.[2] The indictment charged Goland's two codefendants, Lyle Weisman and Sandor Habalow, with four of the five counts. Weisman and Habalow each moved to sever their trials based on their belief that Goland would testify favorably to them if their cases were severed. They also asserted that most of the evidence at a joint trial would concern Goland, not them, and would prejudice them since they were charged with only minor participation in the conspiracy. The district court denied their motions without prejudice, specifically stating that it would reconsider if renewed motions were made later in the trial. The trial began on May 16, 1989.[3] After the government rested, on

---

**1.** In a bifurcated trial, at least one set of codefendants' cases are considered separately from another set's cases, but by the same jury. Generally, the prosecution presents its case on the first group of defendants, followed by their defenses. The jury then deliberates and reaches a verdict, or is hung, on that first group. The prosecution next presents the remainder of its case—that pertaining specifically to the second set of defendants; they present their defenses; and the jury deliberates on their charges. Bifurcation differs from severance in that, with bifurcation, the prosecution makes its case only once and the same jury decides all defendants' cases.

**2.** The indictment charged as follows: count one, conspiracy to defraud the United States by im-

pairing and impeding the lawful function of the Federal Election Commission (FEC), 18 U.S.C. § 371, and knowingly to cause the filing of false campaign finance statements with the FEC, 18 U.S.C. § 1001; counts two and three, causing the treasurer of the Committee to Elect Ed Vallen to the United States Senate to file two false campaign contribution reports with the FEC; count four, making an illegal campaign contribution to the Vallen Campaign Committee, 2 U.S.C. §§ 441a(a)(1)(A), 437g(d); and count five, making a campaign contribution in the name of another, 2 U.S.C. §§ 441f, 437g(d).

**3.** The trial had been delayed briefly while Goland instituted a collateral appeal to this court. See *Goland v. United States*, No. 89–55422 (9th

June 13, all three defendants moved for acquittal. The court denied Goland's motion but reserved ruling on the other defendants' motions until no later than the completion of Goland's case.[4] The court stated that it would rule at the same time on Weisman's and Habalow's pending severance motions if necessary.

At the end of the same day, after Goland had begun his defense, the court *sua sponte* indicated that it likely would sever the codefendants' cases and send Goland's case to the jury before Habalow and Weisman presented their defenses to the same jury. The judge stated, however, that he would only sever the codefendants' trials if Goland assured the court that he would testify for Weisman and Habalow in the event their cases were severed. The trial court apparently believed Goland would do so because Weisman's and Habalow's affidavits supporting their severance motions stated that Goland had agreed to testify favorably to them.[5] Although Goland's and his codefendants' counsel did seek clarification of the court's condition for bifurcation, the record does not indicate that the parties were surprised at the judge's suggestion, and no one objected at that point in the trial.

Goland rested the next morning. He then advised the court that he could make no commitment to testify in his codefendants' cases if they were severed. The judge at that point stated that Weisman and Habalow had not met their burden of showing that Goland would testify for them and that if Goland were not going to do so, there was no need to sever. When asked by the judge for the government's position, the prosecutor agreed that the codefendants had not met their burden and stated that a severance "would be entirely without purpose." The judge then retreat-

ed from his prior position saying that severance "would not be totally without purpose," because if Goland were acquitted, he probably would testify for the codefendants in front of the same jury. The prosecutor stated outright what the judge had only implied—that the jury would almost certainly acquit Weisman and Habalow if it acquitted Goland.

The court next asked the prosecutor what the government's position was on bifurcation rather than severance. The prosecutor responded,

> Your Honor, I've discussed the court's suggested procedure with several of the supervisors in my office and it is our office's unanimous view that the procedure suggested by the court is consistent with the rules. It would be contrary to no authority of which we are aware. It would be an innovative way to bifurcate the trial but that [sic] it would be consistent with the due process rights of all the defendants, and we heartily endorse that suggestion.

The court refused to let Goland's counsel reply to the government's position. It bifurcated the trial, based on Weisman's and Habalow's assurances in the original severance motions that Goland had agreed to testify as the best indication it had of Goland's inclination, and on Goland's decision not to testify in his own case.

Goland's counsel stated that he thought the court's rationale should apply to him, too—that Weisman and Habalow could testify on *his* behalf. The court responded by telling Goland that he had no motion pending.[6] Goland then objected: "[T]he procedure that Your Honor is following prejudices Mr. Goland and I will ... state that on the record." Goland's counsel did not ask to reopen his case to call additional witnesses.

---

Cir. appeal filed May 1, 1989). That appeal is currently pending before this panel.

4. The judge did not actually rule on Weisman's and Habalow's motions for acquittal until June 16, the day the jury began deliberating on Goland's case.

5. Goland's counsel disavowed these affidavits in the severance discussion the evening before Go-

land rested his case and the court bifurcated the trial. Counsel asserted that he had not seen the affidavits, did not know their contents, and had never represented to anyone in the case that Goland would or would not testify.

6. Goland had never moved to sever nor made any motion in response to the bifurcation.

The government presented a brief rebuttal, which consisted of counsel entering into a stipulation; the court then moved on to jury instructions, and counsel made closing arguments. The court instructed the jury, and the jury began deliberating on June 16. As early as the second day of deliberations, the jury told the judge that it could not agree on any of the counts. On July 7, the court gave an *Allen* instruction. On July 10, the jury again said that it could not agree on a verdict.[7] With the defendant's apparent consent, the court granted a mistrial.[8] The judge later questioned the jurors, recording that they had voted eleven to one for conviction on counts one, two, three, and five.

The jury reconvened to hear the codefendants' cases. It acquitted Weisman on all three felony counts, acquitted Habalow on two of three felony counts, and could not agree on Habalow's remaining felony count or either codefendant's misdemeanor count.

On August 2, Goland filed a motion to dismiss on the ground of double jeopardy. The court denied the motion after a hearing on August 28; Goland filed his notice of interlocutory appeal the same day.[9] On September 19, the government filed a second superseding indictment.

7. By then, the jury had deliberated for ten days, with a week-long interruption for a juror's absence. The jury's final note stated,

> We've repeatedly reviewed the evidence in this case. We've discussed many times the facts presented to us by the court. The longer we deliberate, the more we become convinced in our individual decisions as to the guilt or innocence of the defendant. Regretfully, we cannot see how we can come to a unanimous agreement on any of the five counts.

8. The trial judge, Judge Lew, was out of town on July 10 and had assigned the case to another judge, Judge Hatter, in case the jury returned in his absence. Goland alleges that at the last meeting with counsel before Judge Lew left town, Judge Lew had advised counsel that if the jury sent out another note stating that it was unable to reach a verdict (there had been several), he would declare a mistrial. Conferences with counsel during jury deliberations were apparently conducted off the record; according to Goland, this occurred over his objection. Go-

## JURISDICTION

▇ We have jurisdiction to hear an interlocutory appeal of a denial of a motion to dismiss on the ground of double jeopardy under 28 U.S.C. § 1291. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

## STANDARD OF REVIEW

▇ We review de novo a district court's denial of a motion to dismiss the indictment on the ground of double jeopardy. *United States v. Anzalone*, 886 F.2d 229, 230 (9th Cir.1989); *United States v. Schwartz*, 785 F.2d 673, 676 (9th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986).

## DISCUSSION

Goland claims that he should not be retried because to do so would place him in jeopardy a second time. He first argues that the bifurcation was illegal—the prosecuting attorney was clearly wrong in stating that the bifurcation would be contrary to no legal authority. Second, he contends the bifurcation deprived him of his right to have his entire case presented to the jury. In particular, the jury did not get to hear, before it retired to consider the charges against Goland, what Goland alleges would have been favorable testimony from Weis-

land does not contend, however, that he objected during this conference to the judge's decision to declare a mistrial. When the jury again said it could not agree, Goland's counsel himself asked for a mistrial, stating,

> Your Honor, we would ask on the basis of that note that the jury be dismissed and a mistrial declared.... [I]t's quite clear, I think, from discussions we had previously from Judge Lew, if there were a note I think of this kind that were presented, then it would indicate that the jury is, I think, officially unable to come to any verdict and that a mistrial would be declared.

Later in the proceedings, after the jury had been dismissed, Goland again objected to the bifurcation and forewarned the court that he anticipated making a double jeopardy claim.

9. The trial court reset the trial for November 7, believing that the appeal would be decided by then, but stated that in any case it would not begin the retrial until the appeal had been decided.

man and two other witnesses that his codefendants had planned to call. Third, Goland contends that this denial of his "right to present a codefendant's evidence" was a constitutional violation.

Goland contends that the alleged errors are so great that he should not be retried. A second trial would deprive him of his constitutional entitlement to a fair verdict from the jury empaneled to try him. The mistrial should not deprive him of this right, whether or not his request for the mistrial is deemed a consent to it. In addition, "judicial and prosecutorial overreaching" and "judicial or prosecutorial impropriety" *caused* the denial of his right to present a defense. According to Goland, the prosecutor either knew or should have known that he was wrong in claiming there was no authority against the bifurcation. In spite of this, the prosecutor urged the judge to bifurcate—under Goland's theory, so that the prosecution could tailor the indictment more closely to the facts discovered at trial, the government having gotten only a hung jury out of a "lopsided" first trial. In addition, the court would not even permit Goland's counsel to argue against the bifurcation. According to Goland, this prosecutorial and judicial "overreaching" and "impropriety" justifies dismissal on the basis of double jeopardy.

## I. Double Jeopardy

Goland has received the relief ordinarily available to a defendant when reversible error has occurred—a new trial. He asserts, however, that he should not be forced to endure a second trial because the error in his trial is of a nature that implicates a criminal defendant's right not to be placed in jeopardy more than once. In Justice Black's oft-quoted words,

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as

well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957).

### A. Double Jeopardy and Mistrial

Goland's right to have the jury that was empaneled to try him reach a verdict is not absolute. *See Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949) ("[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."). A defendant does not necessarily go free if the trial does not end in a final judgment, *e.g.,* when a mistrial is declared. *Id.* at 688–89, 69 S.Ct. at 836–37.

In certain circumstances, the defendant does go free when a mistrial occurs, provided he neither requested nor consented to the mistrial. *United States v. Dinitz,* 424 U.S. 600, 606–08, 96 S.Ct. 1075, 1078–80, 47 L.Ed.2d 267 (1976); *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971). However, if "manifest necessity" justifies a mistrial, even though neither requested nor consented to by the defendant, the defendant can be retried. *See Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978); *Wade,* 336 U.S. at 689, 69 S.Ct. at 837; *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). The "classic" case of manifest necessity occurs when a trial judge believes "that the jury is unable to reach a verdict." *Washington,* 434 U.S. at 509, 98 S.Ct. at 832; *see also Richardson v. United States,* 468 U.S. 317, 324–26, 104 S.Ct. 3081, 3085–3087, 82 L.Ed.2d 242 (1984) ("we have constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy Clause"; a jury's failure to reach a verdict does not terminate jeopardy); *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982) (the hung jury is the "prototypical example" of manifest necessity).

■ To avoid the consequences of the obvious "manifest necessity," Goland makes an unusual argument based on the peculiar sequence of events in this case. The error in bifurcating, in his view, caused the mistrial. Had the jury had before it the evidence that he contends would have come from the mouths of the other defendants' witnesses, he would have been acquitted; there would have been no mistrial and no "manifest necessity" to declare a mistrial and to discharge the jury. Under this argument, there is no need to consider whether Goland requested a mistrial. It is simply irrelevant.

We cannot subscribe to Goland's argument. Otherwise, any defendant who alleged that testimony or other materials had been excluded erroneously from evidence could make Goland's argument. A rule barring retrial any time a court commits this type of error would be unacceptable in light of society's interest in giving "the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Washington,* 434 U.S. at 505, 98 S.Ct. at 830; *see also Wade,* 336 U.S. at 689, 69 S.Ct. at 837 (public has an interest in "fair trials designed to end in just judgments").

### B.  An Unjustified Second Bite of the Apple?

■ To avoid the consequences of the doctrine of *Kennedy* (that the government's conduct must have been intended "to subvert the protections afforded by the Double Jeopardy Clause," *Kennedy,* 456 U.S. at 675–76, 102 S.Ct. at 2089–90), Goland accepts the substantive relevance of *Kennedy* 's treatment of prosecutorial and judicial overreaching to his case but argues that we should distinguish *Kennedy* from his case because of the differences in timing. In *Kennedy,* the prosecutor's miscon-

duct provoked the defendant into immediately requesting, and receiving, a mistrial, while Goland did not request, nor did the court grant, a mistrial at the time of bifurcation. Goland interprets *Kennedy* 's substantive views on overreaching, however, to support his case. He asserts that *Kennedy* does not require a showing of prosecutorial bad faith or intentional misconduct and has neither attempted to establish nor established the prosecutorial intent necessary under *Kennedy.*[10] Goland asserts that, under *Kennedy,* overreaching is enough to bar his retrial. This is precisely the position, however, that the Supreme Court rejected in *Kennedy.*[11] *Id.* at 675, 102 S.Ct. at 2089. Goland cites *Lovinger v. Circuit Court,* 845 F.2d 739 (7th Cir.1988), nevertheless, in support of his interpretation. According to the *Lovinger* court, a purpose of the double jeopardy clause is to protect the defendant against "the unfairness of a mistrial declaration designed to give the government a second chance to convict when the first is going badly." *Id.* at 743 (citing *Gori v. United States,* 367 U.S. 364, 369, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961)). Goland asserts that he too should be protected from the government's second bite.

Goland relies on this broad purpose statement in *Lovinger* to provide an opening in the *Kennedy/*manifest necessity framework. *Lovinger* 's underlying facts and reasoning, however, do not support his reliance. In *Lovinger* the prosecution was having a very hard time establishing a clear chain of custody over the evidence (cocaine and cannabis). Its witnesses were having recollection difficulties and were contradicting themselves on the stand during direct and cross-examination. During recesses given by the court so that the prosecution could " 'get its act together,' "

---

10. Goland has, however, theorized that the prosecutor encouraged the court to grant a mistrial because the prosecutor believed things were going against him and wanted an opportunity to file a superseding indictment that would improve his chances for conviction. The prosecutor's hearty endorsement of the bifurcation was not, however, his only position on the severance motions. He had opposed severance and agreed with the court that there was no purpose

to severing the trial when it did. We also question why a rational prosecutor would have taken such a risk in this case. His case did not appear to be "going badly," and in the end, he was only one juror shy of conviction.

11. Both the Oregon Court of Appeals in the opinion below and Justice Stevens's concurrence took this position.

*id.* at 741, defense counsel saw the prosecutor and witnesses talking with one another, against the court's instructions. The court eventually declared a mistrial *sua sponte.*[12]

The court held that when the prosecution is going badly, the trial court cannot take away what control the defendant has over the trial and declare a mistrial *sua sponte* when manifest necessity does not justify it. As the Court noted in *Kennedy,* the important consideration for double jeopardy purposes is to permit the defendant to decide what to do if the prosecution errs. 456 U.S. at 676, 102 S.Ct. at 2089. In *Lovinger,* the court took the defendant's control away. Lovinger could very well have been pleased with the prosecutor's hardship and have wanted to continue with the trial, since acquittal by the jury or even by the judge on a motion for acquittal was becoming more and more likely as the trial went on. *See Lovinger,* 845 F.2d at 744. Goland, on the other hand, retained control. He did not request a mistrial or acquittal when the claimed error occurred; and the court did not grant a mistrial. At the end of the trial, the hung jury justified the mistrial.

Goland claims, essentially, that under *Lovinger,* we should excuse him from the manifest necessity bar (if we assume no consent to the mistrial) and the *Kennedy* prosecutorial intent requirement (if he did consent to the mistrial). *Lovinger* permits neither course. *Lovinger* does not hold that prosecutorial overreaching is enough to bar retrial. Furthermore, because Lo-

vinger did not request a mistrial, the seventh circuit applied the manifest necessity standard. Goland cannot rely on *Lovinger* to avoid that bar.[13]

## II. Alleged Error in Bifurcating Trial

### A. Case Authority on Bifurcation [14]

Goland contends, however, that the prosecutorial overreaching in urging bifurcation is relevant in another way: it prevented him from presenting his entire defense, an error so egregious that the double jeopardy clause bars retrial. Goland argues that the bifurcation illegally infringed upon his constitutional right to present his entire defense by preventing the jury from hearing evidence presented by his codefendants.

Other circuits have upheld bifurcation in some instances and found it error in others, although they have in general disapproved it. The courts reversed convictions after bifurcated trials in *United States v. McIver,* 688 F.2d 726 (11th Cir.1982), and *United States v. Stratton,* 649 F.2d 1066 (5th Cir. 1981).[15] In both cases, the appellants' trials had been held after their codefendants' and the jury had convicted at least some of the first-tried codefendants. The courts reasoned that the previous guilty verdicts as to codefendants prejudiced the appellants because the verdicts prevented the jury from being impartial. *McIver,* 688 F.2d at 728–29; *Stratton,* 649 F.2d at 1081–83. In addition, in *Stratton,* the court had permitted the jury to consider when deliberating in the codefendants' trial the appellant's participation in the crimes

---

**12.** The court cited the conversations between the prosecutor and witnesses among other disappointments with the prosecution in the case—delay in bringing the case to trial and lack of discovery before and during trial, even after court order.

**13.** *Lovinger's* facts also are not parallel to those in Goland's case. There is no evidence that the trial was going badly for Goland's prosecutor or that he thought it was. In the end, he was only one juror short of a conviction.

**14.** Through bifurcation, some courts have attempted to retain the efficiencies of joint trials while protecting a defendant's right to compel codefendants to testify on her or his behalf *and*

not abridge the codefendants' right not to testify in their own trial. *See United States v. Crane,* 499 F.2d 1385, 1387–88 (6th Cir.1974).

In considering the alleged bifurcation error, we may only decide the double jeopardy issue on this interlocutory appeal. We must, in particular, address Goland's claim that the prosecutor misrepresented existing authority on bifurcation before the trial judge. We in no way, however, approve or disapprove of the existing authority for or against bifurcation; we do not decide whether bifurcation is proper under these or any circumstances.

**15.** The court remanded for a new trial in each case; it did not prohibit retrial of the successful appellants.

charged, only instructing the jury not to consider the appellant's ultimate guilt or innocence, though the appellant had not been present and was unrepresented. *Id.* at 1080–81. The reviewing court believed that this permission to consider the appellant's participation also harmed the codefendants because a conspiracy was at issue, and the appellant was a major figure in it. *Id.* at 1083.

The eleventh circuit stated specifically in *McIver* that it was not deciding "whether a jury that acquits the first defendant could later be impartial." 688 F.2d at 729. The sixth circuit refused to reverse in *United States v. Crane,* 499 F.2d 1385 (6th Cir. 1974), finding that the bifurcation did not prejudice the appellant because the jury found the first-tried codefendant not guilty. The jury would not have drawn an adverse inference from the codefendant's association with the later-tried appellant.[16] *Id.* at 1388.

Although we express no opinion on bifurcation in general, Goland's trial does not implicate the concerns other circuits have expressed in respect to bifurcation. He was tried first, so he was not prejudiced by his association with prior-tried codefendants. Additionally, the jury later found his codefendants either not guilty or could not agree on a verdict on the charges against them. Goland contends that the prosecutor was "overreaching" or "improper" in stating before the trial judge that case authority did not prohibit bifurcation of Goland's case. We disagree, especially since there is no ninth circuit case law on the issue. Finally, if bifurcation did result in prejudice to Goland, as he contends, retrial will afford him a proceeding free of that prejudice.

### B. *Goland's Right to Have the Jury Hear Exculpatory Evidence*

■ Goland contends that the court's bifurcation decision prejudiced him by preventing him from presenting his full defense. His attorneys assert that they and their codefendants' counterparts cooperated fully in preparing their defenses. Weisman's and Habalow's attorneys filed affidavits supporting this claim. The attorneys discussed which lawyer would call which witnesses. One of Goland's attorneys states that he did not call two witnesses, who he believed "could provide testimony helpful to Mr. Goland," in reliance on the assurance of one codefendant's attorney that he would call them. Additionally, Weisman and his attorney assured Goland that Weisman would testify favorably for Goland if questioned by Goland's counsel at trial. Goland claims that he has a right to this "joint defense," to have the jury hear evidence presented by his codefendants that favors Goland, and that the bifurcation infringed this right.

In support of his assertion of such a right, Goland cites cases confirming that codefendants have an attorney-client privilege for materials and information shared in their joint defense. *See, e.g., Hunydee v. United States,* 355 F.2d 183 (9th Cir. 1965); *Continental Oil Co. v. United States,* 330 F.2d 347 (9th Cir.1964). These cases simply cannot be stretched to support the right to a "joint defense" that Goland claims. A defendant must be prepared to present all evidence in his defense in his own case in chief and cannot count on codefendants. Several events beyond a defendant's control can take codefendants out of a trial. They may change their plea to guilty, they may be acquitted before presenting their case, or their trials may be severed. Goland was on notice that his codefendants' acquittal or severance could occur before he had rested his case because their motions for acquittal were pending at the time the prosecution rested and their motions for severance were pending from the beginning of the trial.

Goland also argues that this claimed "right to present a codefendant's evidence" is constitutional in nature. Goland draws our attention to those cases confirming a defendant's right to present a defense gen-

---

**16.** The court nevertheless questioned the propriety of bifurcation. It recognized that a trial court cannot predict when it bifurcates the trial whether the jury will find the first-tried defendants guilty or not and expressed its belief that this risk makes severance safer. *Id.*

erally. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (a defendant can impeach his own witness to prove his innocence); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (under the sixth amendment right to compulsory process for obtaining witnesses, Texas could not prevent a defendant from calling his coparticipants in the charged crime to testify on his behalf); *Clark v. Blackburn*, 632 F.2d 531 (5th Cir.1980) (the government violated the due process clause by sending informants out of state whom it knew the defendant had subpoenaed, thereby preventing them from testifying); *United States v. Mendez–Rodriguez*, 450 F.2d 1 (9th Cir. 1971) (the government violated the due process rights of a defendant charged with smuggling and transporting aliens when it returned some of the aliens to Mexico before the defendant had the opportunity to question them). These precedents, however, do not relieve counsel of the responsibility to present any evidence crucial to the defense during the defense case in chief.

Goland claims that he valued highly Weisman's and the other witnesses' testimony. He asserts that if his codefendants should have their trials later to permit them to call him, he should be allowed that also. As the court noted, however, Goland had never moved to sever, which would have protected his right to have his codefendants testify in his behalf without infringing their right against self-incrimination in their own trial. After the bifurcation, although he had the opportunity, Goland did not ask the court to reopen his case so he could call other witnesses.

■ No right to a "joint defense" exists that permits Goland to rely on his codefendants to present evidence on his behalf during their cases in chief instead of his own. Goland was responsible for presenting his own case in full. He was not prevented from doing so at his first trial. On retrial, Goland can remedy any error caused by bifurcation by calling his former codefendants and their witnesses to testify in his defense.

## CONCLUSION

Goland's double jeopardy claim is groundless. He can support none of his claims: the prosecutor neither overreached nor does he appear to have intended to subvert the purposes of the double jeopardy clause; Goland has no constitutional right to a "joint defense"; and the mistrial, whether Goland consented to it or not, was granted on account of manifest necessity. Any errors in the first trial can be remedied by a new trial. The mandate shall issue forthwith. No petition for rehearing will be entertained.

We remand to the district court for trial.

TANG, Circuit Judge, specially concurring:

I concur in the majority's opinion because I believe retrial is the appropriate remedy for error in this case. I would also hold that the district court erred in bifurcating the trial *sua sponte* when Goland rested.

The district court informed the parties it would reconsider Goland's codefendants' severance motions upon the close of the government's case. If the trial court also indicated then that it was considering bifurcation, it failed to communicate that thought clearly. Indeed, counsel for Goland's codefendants had repeatedly to request clarification of the court's remarks. The district court did clearly assure all parties, however, that it would not sever if Goland refused to testify. Next, instead of reconsidering severance at the close of the government's case, the district court reconsidered severance at the close of Goland's defense. The district court then *sua sponte* bifurcated the trial. The district court's conduct was thus unclear, inconsistent, and surprising to the parties, all possibly to Goland's prejudice. Moreover, and as the majority's opinion reveals, it is difficult to see on what authority the district court relied for bifurcation. Bifurcation was at least potentially prejudicial to any one of the defendants then before the district court.

Upon appeal we can now conclude that any error in the district court's arriving at its decision to bifurcate, the timing of its decision, or the bifurcation itself was not so grievous as to merit more than the remedy of retrial already available in this case. That is not to say, however, that the district court acted properly. Had the jury convicted Goland, I believe the district court's errors would have compelled reversal and remand for retrial.